STATE OF CONNECTICUT *v.* JOHN WHITE
(SC 20168)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted of the crime of assault in the first degree in connection with an
incident in which he attacked the victim with a box cutter, the defendant
appealed. Immediately after the attack, the victim described the assailant
to the police as a white male wearing a red hooded sweatshirt, and the
police recovered a red hooded sweatshirt and a box cutter near the
crime scene. The police subsequently were notified that the defendant's
DNA profile was a potential match to DNA taken from the recovered
evidence. A detective, P, compiled a photographic array, and another
detective administered the array to the victim at the police station
outside of P's presence. The victim identified the defendant from the
array and wrote on his photograph that she was "pretty certain" that
he was the man who had attacked her. Ten to fifteen minutes later, the
victim met with P and, unprompted by either detective, stated that,
although she had written "pretty certain" on the photograph, she was
"absolutely certain" that the defendant was her assailant. The victim
then provided a written statement to P, in which she reiterated that she
meant that she was absolutely certain about her identification of the
defendant as her assailant, even though she previously had indicated
that she was pretty certain. The defendant was arrested, and he retained
private counsel to represent him, using funds provided by his wife
to pay for attorney's fees and to retain an expert, C, on eyewitness
identification. After jury selection began, the state gave notice of its
intent to introduce DNA evidence and requested that the court order
the defendant to submit to a DNA sample. The court granted the state's
request but continued the trial to allow the defendant an opportunity
to reframe his defense and to locate a DNA expert. The defendant then
filed a motion requesting that the court order public funding so he could
retain a DNA expert, claiming that he was indigent and that he was
constitutionally entitled to such funding. In denying the defendant's
motion for public funding, the trial court declined to find him to be
indigent, noting, inter alia, that, pursuant to this court's decision in *State*
v. *Wang* (312 Conn. 222), requests for public funding for ancillary defense
costs must be made to the Public Defender Services Commission via
the local public defender's office, that the defendant had not applied to
the public defender's office for such funding, and that there was no
authority for the trial court to order payment of a portion of the defense
costs. In light of the defendant's concerns about having to choose
between keeping his privately retained defense counsel or applying for

334 Conn. 742 MARCH, 2020 743

State *v.* White

public defender services, the court indicated that the defendant could apply to the public defender's office for funding without necessarily changing counsel. The defendant, however, elected not to apply for public defender services and retained his private counsel throughout the trial. The trial court also denied the defendant's pretrial motion in limine, which sought to preclude the admission of the victim's postidentification statement to P that she was absolutely certain that the defendant was her assailant and any subsequent in-court statements regarding her confidence at the time of trial in her identification of the defendant. At trial, the victim and P testified about the victim's confidence statement after viewing the array, the victim testified that she was absolutely certain at the time of trial that the photograph she had selected was of her attacker, and C, the expert witness whom the defendant ultimately retained, testified concerning the reliability of eyewitness identifications. On appeal from the judgment of conviction, the defendant claimed that the trial court improperly denied his request for public funding for a DNA expert and his motion in limine to preclude the victim's postidentification confidence statements. *Held*:

1. The defendant failed to establish his indigence because of his decision not to apply to the Public Defender Services Commission via the local public defender's office for his requested public funding, and, accordingly, the record lacked an essential factual predicate necessary for this court to review his claim that the trial court violated his constitutional rights by denying his motion for public funding to pay for a DNA expert to assist in his defense solely on the ground that he had retained private counsel: a defendant's right to publicly funded expert or investigative services under the due process clause of the fourteenth amendment, to the extent that such services are reasonably necessary to formulate and present an adequate defense to pending criminal charges, belongs only to indigent criminal defendants, and the trial court properly declined to find the defendant indigent and instead referred him for further action to the Public Defender Services Commission via the local public defender's office, as courts are not statutorily authorized to fund ancillary defense costs for indigent defendants, and, consistent with the statute (§ 51-297) governing the determination of indigency in connection with the appointment of or request for a public defender, this court's decision in *Wang* makes clear that a defendant claiming to be indigent and seeking public funding for ancillary defense costs should be referred to the commission via the local public defender's office for a determination of indigency in the first instance, subject to judicial review via appeal to the trial court; moreover, the defendant's choice of counsel concerns, which were premised on the policy of the Office of the Chief Public Defender to deny all public funding unless the defendant is represented by a public defender or assigned counsel, were unfounded on the record of this case.

State *v.* White

2. The trial court did not abuse its discretion in denying the defendant's
   motion in limine to preclude the victim's postidentification confidence
   statement to P and any in-court statements regarding her confidence at
   the time of trial in her identification of the defendant: in light of applica-
   ble case law holding that a witness' confidence in an identification, both
   at the time it was made and at trial, is a relevant factor to be considered
   in the determination of whether an identification is reliable, the trial
   court did not abuse its discretion in concluding that the victim's pro-
   fessed level of confidence in her identification shortly after she made
   it and at trial was relevant to the jury's determination of whether the
   defendant was the victim's assailant; moreover, the trial court reasonably
   concluded that the victim's postidentification confidence statements
   were not more prejudicial than probative, as those statements would
   not unduly arouse the jurors' emotions or be so persuasive as to over-
   whelm the jury's capacity to fairly evaluate the evidence, and also reason-
   ably concluded that those statements did not invade the province of
   the jury, as a witness' testimony regarding the witness' confidence in
   an identification of which the witness has personal knowledge is simply
   a tool that the jury uses to evaluate the accuracy or credibility of the
   identification; furthermore, in the absence of any evidence indicating a
   recent shift in the relevant social science, this court declined to adopt
   a categorical rule precluding the admission of evidence of a witness'
   confidence in his or her identification, unless the evidence stems from
   the earliest identification procedure that complies with the statute (§ 54-
   1p) containing the guidelines that the police must follow in conducting
   eyewitness identification procedures, because a defendant may chal-
   lenge such confidence statements by presenting expert testimony on
   the reliability of eyewitness testimony, as the defendant did in the pres-
   ent case.

(*Four justices concurring separately in one opinion*)

Argued December 12, 2018—officially released March 3, 2020

*Procedural History*

Substitute information charging the defendant with
the crime of assault in the first degree, brought to the
Superior Court in the judicial district of Waterbury,
where the court, *Murphy, J.*, denied the defendant's
motion to preclude certain evidence; thereafter, the
court, *Murphy, J.*, denied the defendant's motion for
costs to pay for expenses associated with procuring an
expert for the purpose of presenting a criminal defense;
subsequently, the case was tried to the jury; verdict
and judgment of guilty, from which the defendant
appealed. *Affirmed.*

State *v.* White

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom were *Marc G. Ramia*, senior assistant state's attorney, and, on the brief, *Maureen Platt*, state's attorney, for the appellee (state).

*Charles D. Ray* and *Brittany A. Killian* filed a brief for The Innocence Project as amicus curiae.

*Lauren Weisfeld*, chief of legal services, and *Deborah Del Prete Sullivan*, director of legal counsel, filed a brief for the Office of the Chief Public Defender as amicus curiae.

*J. Christopher Llinas* and *Ioannis A. Kaloidis* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

ROBINSON, C. J. The defendant, John White,[1] appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). On appeal,[2] the defendant claims that the trial court improperly denied his motions (1) seeking public funds to pay for a DNA expert to assist in his defense, and (2) to exclude certain evidence of the victim's confidence in her identification of the defendant when presented with a photographic array by the police. We disagree with the defendant's claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. On May 17, 2009, the victim, April Blanding, spent the afternoon and evening drinking alcohol and smoking

[1] The defendant also appears to be known as "John Kryzak."

[2] The defendant appealed from the judgment of conviction to the Appellate Court, and we subsequently granted his motion to transfer the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

State *v.* White

marijuana and crack cocaine at the home of her friend, Tara Coleman. Coleman lived on Rose Street in Waterbury, which runs parallel to Wood Street, and the backyards of the homes on the two streets adjoin. At approximately 11 p.m., the victim left Coleman's home to walk to a nearby store to purchase a beverage.

As she approached the end of Rose Street, the victim encountered a man, later identified as the defendant, sitting on the porch of an abandoned house approximately twelve to twenty feet away from her. The defendant had cuts on his face and was wearing a red hooded sweatshirt. The defendant asked the victim if she was "tricking tonight," and the victim replied "no" and continued on her way to the store. While walking back to Coleman's house after making her purchases, the victim saw the defendant still sitting on the same porch. Shortly after the victim passed the defendant, she felt someone walking behind her. As she stepped onto Coleman's driveway, the defendant tapped her on the shoulder and said: "Lady, guess what? You're dead, you're dead, you're dead. As of right now, you are a dead woman." The defendant tripped the victim, who landed on her back, jumped on top of her and repeatedly stabbed her with what later was discovered to be a box cutter in her neck, face, head, chest, finger, and arm.

A resident on the third floor of Coleman's building overheard the victim shouting, looked out his window and saw the victim and a white male wearing a red hooded sweatshirt, and then yelled down to ask if they were alright. At that point, after some ten to fifteen minutes of struggling with the defendant, the victim managed to "thr[ow] him off of [her]." The defendant then stopped the attack and ran down the driveway toward a wooded area behind Coleman's home.

The victim ran to Coleman's front door screaming for help. When she saw the victim, Coleman called 911. The victim told responding police officers that she had

State *v.* White

been attacked in the driveway by a white male wearing a red hooded sweatshirt. The victim was transported by ambulance to Saint Mary's Hospital where she underwent surgery for her injuries.

After the police had secured the scene, officers recovered a red hooded sweatshirt from the side of an abandoned house on Wood Street, "[toward] the end of the driveway, right in between where the wood[ed] area was" behind Rose Street. The police also found a bloodstained box cutter in the backyard of another home on Wood Street adjacent to Coleman's home.

Although the initial investigation did not initially produce a suspect, approximately four years later, in 2013, Waterbury police obtained information regarding a potential DNA match on a piece of evidence recovered near the crime scene. The victim went to the police department on October 14, 2013, where she identified the defendant in a double-blind, sequential photographic array procedure. The victim wrote on the defendant's photograph: "I . . . am pretty certain that this is the young man who stabbed [me] 6 times on May of 2009 at 11 p.m. . . . on Rose Street in Waterbury . . . ." Afterward, the victim was interviewed by Detective John Pesce, and she told him that she was in fact "absolutely certain" with respect to her prior identification. Subsequent forensic testing revealed the presence of both the defendant's and victim's DNA on the red hooded sweatshirt and the victim's DNA on the box cutter.

The defendant was arrested in 2016 and charged with assault in the first degree in violation of § 53a-59 (a) (1). Jury selection began on December 7, 2016. The following day, the state filed a notice of its intent to introduce DNA evidence pursuant to General Statutes § 54-86k, as well as a motion for nontestimonial evidence pursuant to Practice Book §§ 40-32 and 40-34 (6), requesting to sample the defendant's DNA by buccal

State *v.* White

swab. Over the defendant's objection, the trial court granted the state's motion but gave the defendant a continuance to allow him to locate an expert and to reframe his defense. The defendant subsequently filed a motion seeking public funds to pay for a DNA expert, which the trial court denied following a hearing. The two jurors who already had been selected were excused, and jury selection began again on December 19, 2016. The trial court then denied the defendant's motion to suppress the victim's pretrial identification of him from the photographic array, as well as his motion in limine, which sought to preclude both the victim's postident-ification statements and any in-court statements regard-ing her confidence in the accuracy of her identification. The jury subsequently returned a verdict of guilty, and the trial court rendered judgment in accordance with the verdict. The trial court sentenced the defendant to a total effective sentence of twenty years of incarceration, with a mandatory minimum of five years of incarcer-ation, consecutive to a fifteen year sentence that the defendant is serving in Missouri. This appeal followed.

On appeal, the defendant raises two claims. First, he claims that the trial court abused its discretion and violated his federal and state constitutional rights when it denied his motion for funds for a DNA expert to assist in his defense. Second, he claims that the trial court abused its discretion when it denied his motion in limine seeking to preclude certain evidence of the victim's confidence in her identification of the defendant when presented with a photographic array by the police. We address each claim in turn, setting forth additional rele-vant facts and procedural history when necessary.

I

The defendant first claims that the trial court abused its discretion and violated his federal and state consti-tutional rights when it denied his motion for public

State *v.* White

funds to obtain a DNA expert to assist in his defense in challenging the state's DNA mixture results. The record reveals the following additional relevant facts and procedural history. At all times relevant to this appeal, the defendant was represented by private counsel, Attorney Ioannis A. Kaloidis. The defendant's wife had paid for Kaloidis' attorney's fees and the expenses associated with his retention of an eyewitness identification and memory expert.

The day after jury selection began, the state gave notice of its intent to introduce evidence of DNA analysis and moved for permission to obtain a DNA sample from the defendant via a buccal swab in order to compare the defendant's DNA against samples taken from the red hooded sweatshirt and the box cutter recovered from Wood Street. Defense counsel objected, claiming that the state's notice was untimely under § 54-86k (c), which requires that such notice be given at least twenty-one days prior to the commencement of trial, and that allowing the state to sample the defendant's DNA constituted an unfair surprise and was prejudicial. On December 12, 2016, the trial court overruled the objection and granted the state's motion, finding that, although it was "extremely bothered that [the parties were] having this conversation three days . . . from the beginning of evidence,'' the state nonetheless had established good cause to test and introduce DNA evidence on the eve of trial.[3] The trial court then granted the defendant a continuance for as much time as he needed to prepare for trial in light of the state's late disclosure and, with the parties' agreement, dismissed the two jurors who already had been selected.

The next day, December 13, 2016, the defendant filed a motion seeking public funds to pay for a DNA expert to assist in his defense, as well as an accompanying

---

[3] On appeal, the defendant does not challenge this ruling.

State *v.* White

memorandum of law and a financial affidavit in which he asserted that he was indigent. In his memorandum of law, the defendant argued that, since this court issued its decision in *State* v. *Wang*, 312 Conn. 222, 92 A.3d 220 (2014), "it has been the practice in this state that requests for funding go through the Public Defender [Services] Commission [(commission)]. Such requests have routinely been denied except in cases [in which] counsel has been appointed as assigned counsel by the public defender's office. In the present case, the undersigned [counsel] is privately retained counsel." The court held a hearing on the motion on December 14, 2016, at which the defendant argued that an expert who would evaluate the results of the state forensic science laboratory was necessary to his defense given the anticipated importance of DNA evidence at trial. The defendant argued that the trial court could grant his motion, even though he was not represented by a public defender or assigned counsel, because his choice of counsel was a constitutionally protected right.

After hearing argument, the trial court denied the defendant's motion in an oral decision. The trial court declined to find the defendant indigent because, inter alia, he had been represented by private counsel to this point and his defense experts had been, or were being, paid, and he had not applied to the public defender's office, leaving the trial court without access to the results of an indigency investigation to aid its indigency determination.[4] The trial court, citing *Wang*, then

---

[4] In its decision, the trial court noted that "the defendant has been represented by private counsel since the beginning of this case, that he has been receiving, whether it's from his pocket or someone else's pocket, his attorney is being paid. His experts have been paid or are in the process of being paid. . . . I cannot make a finding [that] the defendant is indigent and has no means to pay for the services that he can—I cannot make a finding that he doesn't have any source of funds. I certainly [can] make a finding that he has no income and no assets based on his testimony, but I also cannot make a finding that he has no other sources of assets." Significantly, the trial court observed that, because the defendant had not yet applied to the public defender's office, the trial court did not, at the time of its decision, have access to the results of an indigency investigation.

State *v.* White

explained that a request for public funding for defense expenses must be made to the commission via the local public defender's office and that there was no authority for the trial court to order payment of a portion of the defense costs. The trial court also was not convinced that the defendant had established that a private DNA expert was necessary to his defense, noting that ''[t]he state lab is a public institute and is going to analyze the [DNA] results . . . [a]nd, so, it's not clear . . . what an expert adds to the equation on the part of the defense.'' Further, the trial court explained that the defendant could apply for funds from the public defender's office without necessarily changing defense attorneys.[5] The trial court then took a recess to allow the defendant and Kaloidis to confer as to whether the defendant wished to apply for public defender services. Kaloidis subsequently informed the court that the defendant had elected to retain his existing private counsel and would not submit an application to the public defender's office.

On appeal, the defendant claims that the trial court improperly denied his motion for public funds to obtain

[5] The trial court also suggested that the defendant could waive counsel and have standby counsel appointed, attempt to have the public defender's office make an arrangement with Kaloidis, ask the public defender's office to file an appearance in addition to Kaloidis' appearance, or seek representation by the public defender's office.

The trial court then clarified its ruling, which was made in the presence of both the defendant and Kaloidis: ''I know you've indicated [that the defendant] does not want to apply for the public defender, but you can talk to him a little bit more about what that will mean. If he wishes to apply for the public defender, you know, for the purpose of an investigation on indigency, or for the purpose of him actually being represented by the public defender's office, and, as I said, whether that means you represent him as a special public defender or someone comes in as a cocounsel, or whatever scenario works out. I'll allow you to investigate that and him to apply.

''So, what I will do is this. I'm going to take a recess; you can talk to him. If you feel it's appropriate, then he should make an application for the public defender services. And, if that occurs, then I will hear that motion in front of me. Someone obviously from the public defender's office needs to appear in front of me to disclose the result of [its] investigation, and then I will rule if there is an application. If there is no application for [the] public defender, then we will discuss scheduling.''

State *v.* White

a DNA expert. The defendant acknowledges that, although he was indigent and had been incarcerated for years in Missouri, his family had sufficient funds to hire a private attorney for him, as well as an eyewitness identification expert. The defendant claims, however, that, when the state decided at the last minute to perform additional DNA testing that resulted in evidence of DNA from both the defendant and the victim being present on the red hooded sweatshirt, his family could not afford the additional funds necessary for a DNA expert. The defendant argues that the trial court had discretion to order funds either independently or through the commission pursuant to *Wang* and that his motion for funds was denied solely because he had private counsel in violation of his constitutional rights under *Ake* v. *Oklahoma*, 470 U.S. 68, 76–85, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985). In response, the state argues that the trial court did not deny the defendant's motion for funds solely because he had retained private counsel; rather, the trial court denied the defendant's motion because the defendant had refused to file the application necessary for the commission to investigate his claim of indigence. Indeed, the state argues that, under our interpretation of General Statutes §§ 51-289 (*l*) and 51-292, as expressed in *State* v. *Wang*, supra, 312 Conn. 249–56, the commission is the *only* entity authorized to grant requests for public funds to be used for ancillary defense costs such as expert witnesses. Accordingly, the state argues that the trial court properly denied the defendant's motion because it lacked discretion altogether to consider a request to fund ancillary defense costs. We agree with the state's argument that the defendant failed to establish his indigence because of his decision not to apply to the commission, and, therefore, the record lacks an essential factual predicate necessary for us to review his constitutional claims under *Ake*.

We begin with a review of our decision in *Wang*, which addressed several issues that arose from a request by

State *v.* White

the indigent, self-represented defendant, Lishan Wang, for public funding to retain experts and investigators to aid in his defense at his murder trial, including whether a right to such funding exists and which governmental entity, the commission or the Judicial Branch, would be obligated to provide those funds. *State* v. *Wang*, supra, 312 Conn. 224–26. Wang was found to be indigent and was appointed public defender representation, but he subsequently filed a motion to represent himself, which was granted by the trial court. Id., 227. After the hearing on his motion, at which he waived his right to counsel after being formally canvassed by the court, Wang represented himself with the assistance of the Office of the Chief Public Defender (OCPD) as standby counsel. Id. Wang subsequently requested that the trial court order public funding to enable him to retain experts and an investigator, claiming that he was constitutionally entitled to such experts and investigator in order to formulate and present his defense. Id. The OCPD declined the request to provide that funding. Id., 227–28.

Relying on the United States Supreme Court's decision in *Ake* v. *Oklahoma*, supra, 470 U.S. 68, we concluded that "an indigent self-represented criminal defendant has a fourteenth amendment due process right to publically funded expert or investigative services, to the extent that such services are reasonably necessary to formulate and to present an adequate defense to pending criminal charges."[6] *State* v. *Wang*, supra, 312 Conn. 231. We further concluded that an indigent, self-represented defendant need not accept representation from a public defender in order to obtain public funding for reasonably necessary ancillary defense costs, noting that, "[w]hereas the right of self-representation directly

[6] In *Wang*, we observed as a preliminary matter "that the right articulated in *Ake* is not contingent upon the penalty sought or the field of assistance demanded, so long as that assistance is reasonably necessary for the indigent defendant to have a fair opportunity to present his defense." (Internal quotation marks omitted.) *State* v. *Wang*, supra, 312 Conn. 236–37.

State *v.* White

conflicts with the right to counsel pursuant to the sixth amendment, no such conflict exists between the right of self-representation and the right to access the basic tools of an adequate defense pursuant to the fourteenth amendment. Indeed, an indigent defendant . . . is entitled *both* to the constitutional right to counsel *and* the constitutional right to be provided with the basic tools of an adequate defense.'' (Emphasis in original; internal quotation marks omitted.) Id., 239.

Considering next which governmental entity is obligated to provide the public funds sought by Wang, we concluded that, although the commission is statutorily authorized to fund the reasonably necessary ancillary defense costs for indigent, self-represented defendants,[7] the Judicial Branch is not so authorized. We reasoned that, because ''the statutes governing public defender services, § 51-289 et seq., vest authority in the commission as an autonomous body for fiscal purposes, and require the commission to approve reasonably necessary defense costs prior to expenditure from the commission's budget,'' a trial court does *not* ''[retain] discretion to authorize public funding for ancillary defense costs for self-represented defendants based upon its threshold determination that such costs are reasonably necessary to an adequate defense.'' Id., 257. In concluding that the commission was obligated to pay the ancillary defense costs of Wang, an indigent, self-represented defendant, we emphasized that he had standby counsel appointed by the trial court; see id., 262–63 and n.37; and that § 51-292 authorized the commission ''to fund reasonably necessary ancillary defense costs incurred by standby counsel who, thusly appointed, is serving pursuant to the provisions of the chapter of the General Statutes governing public defender services,'' mean-

_____

[7] In *Wang*, we observed that ''implicit in the phrase 'upon approval of the commission' in § 51-292 is the recognition that the commission may use its own established procedures for evaluating whether ancillary costs are reasonably necessary.'' *State* v. *Wang*, supra, 312 Conn. 256.

State *v.* White

ing that "an indigent self-represented defendant may access funding for reasonably necessary defense costs through standby counsel." Id., 254–55; see also id., 253 (discussing General Statutes § 51-291 (11) and noting that "[t]he statutes governing public defender services require the chief public defender to maintain a list of attorneys who may be appointed as standby counsel for self-represented defendants, as needed"). We emphasized, however, that our holding in *Wang* was "limited to the provision of publicly funded expert or investigative assistance for an indigent self-represented defendant at a criminal trial. . . . [W]e express[ed] no view as to whether an indigent defendant represented by pro bono counsel is entitled access to public funding for expert or investigative assistance." Id., 239 n.18.

In the present case, the defendant claims that his motion for public funds was denied solely because he had retained private counsel, in violation of his constitutional rights, which effectively asks us to decide the issue we left unaddressed in *Wang*. At the outset, however, we emphasize that the fourteenth amendment due process right to publicly funded expert or investigative services, to the extent that such services are reasonably necessary to formulate and to present an adequate defense to pending criminal charges, belongs only to *indigent* criminal defendants. Id., 231; see *Ake* v. *Oklahoma*, supra, 470 U.S. 76 ("[The United States Supreme Court] has long recognized that when a [s]tate brings its judicial power to bear on an *indigent* defendant in a criminal proceeding, it must take steps to [ensure] that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the [f]ourteenth [a]mendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, *simply as a result of his poverty*, a defendant is denied the opportunity to participate meaningfully in a judicial

State *v.* White

proceeding in which his liberty is at stake.'' (Emphasis added.)). Before we consider any questions left open by *Wang* concerning the connection between an indigent defendant's access to public funding for expert or investigative services and the nature of his legal representation, we must consider the existence of the threshold factual predicate to such an inquiry, namely, *the indigency of the defendant*. In contrast to *Wang*, in which Wang's indigency was undisputed; *State* v. *Wang*, supra, 312 Conn. 226–27; the trial court in the present case expressly declined to find that the defendant was indigent. See footnote 4 of this opinion and accompanying text.

Determining whether the trial court properly declined to find the defendant indigent and instead referred him to the public defender's office requires us to consider the respective roles of the trial court and the public defender in that process. We previously have held that the ''trial court's assessment of the defendant's offer of proof pertaining to whether he was indigent and was, therefore, eligible for state funded expert assistance, is a factual determination subject to a clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . .

''It is the duty of the state to provide adequate means to [ensure] that no indigent accused lacks full opportunity for his defense . . . . The right to legal and financial assistance at state expense is, however, not unlimited. Defendants seeking such assistance must satisfy the court as to their indigency . . . . This has largely been accomplished through [public defender services] . . . which has promulgated guidelines that are instructive as to the threshold indigency determination. . . .

State *v.* White

"[General Statutes §] 51-297 (a) requires the public defender's office to investigate the financial status of an individual requesting representation on the basis of indigency, whereby the individual must, under oath or affirmation, set forth his liabilities, assets, income and sources thereof. . . . [General Statutes §] 51-296 (a) requires that, [i]n any criminal action . . . the court before which the matter is pending shall, if it determines after investigation by the public defender or his office that a defendant is indigent as defined under this chapter, designate a public defender . . . to represent such indigent defendant . . . . Upon a determination by the public defender that an individual is not eligible for its services, the individual may appeal the decision to the court before which his case is pending.'' (Internal quotation marks omitted.) *State* v. *Henderson*, 307 Conn. 533, 540–41, 55 A.3d 291 (2012); see also *Newland* v. *Commissioner of Correction*, 322 Conn. 664, 693, 142 A.3d 1095 (2016) (*McDonald, J.*, dissenting) (''[u]nder the chapter of our General Statutes governing public defender services, indigent defendant means . . . a person who is formally charged with the commission of a crime punishable by imprisonment and who does not have the financial ability at the time of his request for representation to secure competent legal representation and to provide other necessary expenses of legal representation'' (emphasis omitted; internal quotation marks omitted)).

Particularly after *Wang*, we understand our case law to establish that the trial court's role in the indigency determination is secondary to that of the public defender's office, insofar as the commission is the entity statutorily authorized to investigate and determine claims of indigency through local public defender's offices. See *State* v. *Martinez*, 295 Conn. 758, 784–85 n.21, 991 A.2d 1086 (2010); see also *State* v. *Flemming*, 116 Conn. App. 469, 481, 976 A.2d 37 (2009) ("the office of the

State *v.* White

public defender is the *only* entity upon which a statutory duty is imposed to investigate a claim of indigency'' (emphasis in original; internal quotation marks omitted)). As we observed in *Wang*, ''the primary purpose of [No. 74-317, § 7, of the 1974 Public Acts (P.A. 74-317), which was codified at . . . § 51-296, governing the designation of public defenders for indigent defendants] was the creation of [the commission] to administer the public defender system *in lieu of the judges of the Superior Court*, who previously had been responsible for that function. . . . Therefore, by designating the commission as the agency responsible for carrying out the purposes of the chapter governing public defender services, the legislature has charged the commission with protecting the rights of indigent criminal defendants.'' (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Wang*, supra, 312 Conn. 250–51; see *State* v. *Martinez*, supra, 782 (''It is the duty of the state to provide adequate means to [ensure] that no indigent accused lacks full opportunity for his defense . . . . This has largely been accomplished through [the Division of Public Defender Services] . . . which has promulgated guidelines that are instructive as to the threshold indigency determination.'' (Citations omitted; internal quotation marks omitted.)).

Indeed, the statutes governing indigent defense expressly recognize that the trial court's role in the indigence determination process is secondary to that of the commission. Section 51-297 (g) provides that, ''[i]f the Chief Public Defender or anyone serving under the Chief Public Defender determines that an individual is not eligible to receive the services of a public defender under this chapter, the individual may appeal the decision to the court before which the individual's case is pending.'' This is where the trial court assumes its role in the indigency determination; it has the authority to review the public defender's indigency determination in light of the additional information obtained from the

State *v.* White

public defender's office's investigation and that office's rationale for denying the defendant's application. See *Newland* v. *Commissioner of Correction*, supra, 322 Conn. 707–708 (*McDonald, J.*, dissenting).

Consistent with § 51-297 (g), *Wang* makes clear the imperative of referring a defendant claiming to be indigent and seeking in the first instance public funding for ancillary defense costs to the commission via the local public defender's office. First, unlike the commission, the Judicial Branch is not statutorily authorized to fund the reasonably necessary ancillary defense costs for indigent, self-represented defendants.[8] See *State* v. *Wang*, supra, 312 Conn. 256, 256–57 n.33. Indeed, we specifically held in *Wang* that, because "the statutes governing public defender services, § 51-289 et seq., vest authority in the commission as an autonomous body for

---

[8] In *Wang*, "we implicitly conclude[d] that the Judicial Branch is not authorized to pay expert or investigative fees that are reasonably necessary to an indigent self-represented litigant's defense. . . . Although the legislature included reasonably necessary 'costs of defense' within the commission's budget in § 51-292, the legislature did not similarly include such expenses within the budget of the Judicial Branch. Thus, ordering the Judicial Branch to provide funding for reasonably necessary ancillary defense costs in the present case, or in any case, would effectively usurp the power of the legislature to devise a state budget. Out of respect for the will of the legislature, we therefore conclude that the commission must provide funding for reasonably necessary ancillary defense costs of indigent, self-represented defendants.

"Additionally, our conclusion that the commission, and not the Judicial Branch, is authorized to fund reasonably necessary defense costs for indigent self-represented defendants is consistent with the legislature's intent to create separation between the public defender system and the Judicial Branch. See *Gipson* v. *Commissioner of Correction*, [257 Conn. 632, 648, 778 A.2d 121 (2001)] ('the primary purpose of P.A. 74-317 was the creation of a public defender services commission to administer the public defender system in lieu of the judges of the Superior Court, who previously had been responsible for that function').

"While the legislature could ultimately decide to provide for an alternative source of funding for the expenses at issue . . . we conclude that, under the existing legislation, the commission is presently authorized to fund the reasonably necessary ancillary defense costs of indigent self-represented defendants." (Citation omitted.) *State* v. *Wang*, supra, 312 Conn. 256–57 n.33.

State *v.* White

fiscal purposes, and require the commission to approve
reasonably necessary defense costs prior to expendi-
ture from the commission's budget,'' a trial court does
*not* ''[retain] discretion to authorize public funding for
ancillary defense costs for self-represented defendants
based upon its threshold determination that such costs
are reasonably necessary to an adequate defense.'' Id.,
257. With the trial court lacking such discretion, resort
to the commission is necessary in the first instance, sub-
ject to judicial review via appeal to the trial court.[9] See
*State* v. *Garvins*, Superior Court, judicial district of
Fairfield, Docket No. FBT-CR-16-293596-T (December
12, 2017) (65 Conn. L. Rptr. 596, 596) (relying on *Wang*
and granting indigent defendant's motion for funds for

---

[9] We acknowledge the potential tension between our analysis in the pres-
ent case and in this court's decision in *State* v. *Martinez*, supra, 295 Conn.
758, a pre-*Wang* case in which we considered whether the trial court had
properly denied the request of the defendant, Luis Norberto Martinez, for
a state funded DNA expert on the ground that he had failed to sustain his
burden of proving his indigence. A public defender was appointed to repre-
sent Martinez when he was arraigned, but, when the case was transferred
to part A of the trial court, private counsel appeared in lieu of the public
defender. Id., 778. In light of the results of a DNA test, Martinez filed a
motion asking the court to appoint a DNA expert. Id., 779–80. The state
responded to the motion by arguing that Martinez had not proven his indi-
gence and had not provided the court with an adequately specific request
for expert assistance. Id., 780. The trial court denied the motion on the basis
of, inter alia, '' 'the availability of funds to [Martinez] that were used for
other purposes that could have been used for this.' '' Id., 780–81. On appeal,
we concluded that the trial court's determination that Martinez did not meet
his burden of proving indigency and, thus, was not entitled to a state funded
expert, was not clearly erroneous. Id., 783–84; see id., 784 (This court noted
the lack of evidence in support of Martinez' indigency, including the fact
that his financial affidavit ''did not include any information concerning his
liabilities or assets or those of his mother with whom he was living. Moreover,
as the trial court recognized, [Martinez] was represented by private counsel
after refusing to permit a public defender to represent him.'' (Footnote
omitted.)). Accordingly, we further concluded that ''the record [was] inade-
quate for us to reach the constitutional issue, as [Martinez had] failed to
establish the threshold requirement of his indigency.'' Id., 784–85. To the
extent that *Martinez* may be read to afford the trial court the discretion to
make an indigency finding in the first instance, we conclude that it is no
longer good law in light of the subsequent statutory analysis in *Wang*.

expert witness, despite public defender's initial refusal to pay because defendant was represented by pro bono counsel and not public defender, and ordering that "the defendant . . . follow the protocol of the OCPD in applying for such funds and that the OCPD shall not unreasonably deny such funds"); id., 597 (concluding that indigent defendant represented by pro bono counsel is constitutionally entitled to public funds for expert witness); see also *State* v. *Thomas*, 177 Conn. App. 369, 402–404, 173 A.3d 430 (trial court did not abuse its discretion by denying defendant's motion for costs for investigative services because, inter alia, trial court did not make threshold indigency finding and, therefore, lacked discretion to grant motion pursuant to *Wang*), cert. denied, 327 Conn. 985, 175 A.3d 43 (2017). Moreover, requiring the defendant to proceed through the commission in the first instance is consistent with the separation of powers, insofar as "[r]equiring the trial court to determine whether certain experts or investigators are reasonably necessary to the defense could potentially call the trial court's role as a neutral arbiter into question." *State* v. *Wang*, supra, 312 Conn. 264; see id., 263–64 ("[t]he legislature created the commission, in part, in order to separate the administration of the public defender system from the Judicial Branch"). Accordingly, we conclude that the trial court properly declined to find the defendant indigent and instead referred him for further action to the commission via the local public defender's office.

The defendant contends, however, that the trial court's approach raises concerns with respect to his right to choice of counsel and futility of remedy because "the public defender routinely denies a request for expert funds when the defendant has private counsel . . . ." The OCPD, appearing as amicus curiae, confirms that, because *Wang* did not determine whether a defendant represented by private counsel could obtain state

State *v.* White

funding for ancillary defense costs, the commission has "adopted a policy that only indigent pro se litigants or individuals represented by a public defender or assigned counsel can access funding for experts or other expenses. If a person represented by a private attorney seeks funding, they must also accept representation from the public defender or proceed pro se. The private attorney must withdraw his appearance. The case will be referred to the local public [defender's] office for an eligibility determination, and, if the defendant is indigent, the case will be assigned to an attorney in the office or to assigned counsel if there is a conflict of interest." At oral argument before this court, the defendant suggested that the OCPD's representation of its internal policy means that he was forced to choose between his constitutional rights because his private counsel must *first* have withdrawn *before he could apply* to the public defender's office.[10]

We conclude that the defendant's concerns about futility and loss of counsel are unfounded on the record of this case. First, we do not understand the OCPD's amicus brief to suggest that the relationship with private counsel must be terminated *before* the commission conducts an initial investigation of indigency and reviews the application for assistance with defense costs; rather, we understand that policy to suggest that any defendant seeking public funding for defense costs must ultimately accept representation from the public defender or proceed as a self-represented party prior to receiving such funding once eligibility is determined.[11] Consistent

---

[10] The defendant's supplemental brief echoes this concern, stating that the OCPD policy that "private counsel must first withdraw before the public defender will even consider eligibility . . . creates a significant risk that the defendant might end up without any counsel . . . ." (Citation omitted; footnote omitted.)

[11] The defendant's reading of the OCPD amicus brief runs counter to our understanding of the timing of the public defender application process. For example, as was discussed in colloquy at oral argument before this court, it would be extraordinarily unusual for a trial court to allow defense counsel to withdraw prior to trial in the absence of substitute counsel, unless the

334 Conn. 742 MARCH, 2020 763

State *v.* White

with that reading, the trial court expressly stated that Kaloidis would be permitted to continue to represent the defendant during the application process and offered the defendant other options, such as continuing to represent the defendant as a special public defender, standby counsel, or with cocounsel, to be determined later. See footnote 5 of this opinion and accompanying text. Beyond establishing his indigence, the trial court's desire to have the defendant explore these options in the first instance was especially apt, particularly given the link that the court in *Wang* made between the commission's ancillary defense resources and its provision of services, including standby counsel. See *State* v. *Wang*, supra, 312 Conn. 254–55. With the defendant having declined to follow the trial court's instruction to apply for the services of a public defender, the factual predicate for his constitutional claims is simply not present because we lack the requisite finding that he is indeed indigent or subject to the loss of his counsel of choice. See *State* v. *Martinez*, supra, 295 Conn. 784–85 ("the record is inadequate for us to reach the constitutional issue[s], as the defendant has failed to establish the threshold requirement of his indigency"). Accordingly, we decline to consider the defendant's remaining constitutional claims. See, e.g., *St. Paul Travelers Cos.* v. *Kuehl*, 299 Conn. 800, 813, 12 A.3d 852 (2011) (court has "duty to eschew unnecessarily deciding constitutional questions" (internal quotation marks omitted)).

client had properly elected the right of self-representation. Additionally, even if an applicant for public defender services is found to be indigent, that applicant need not accept public defender representation. See, e.g., *Faretta* v. *California*, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) ("a defendant in a state criminal trial has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so" (emphasis in original)). Ultimately, we are not convinced that, simply by applying to the public defender's office, the defendant would be compelled to forgo his right to counsel in order for the public defender's office to make an indigency determination. We simply do not know what the commission would have done in the present case because the defendant declined to apply to the commission, which has the capacity and statutory authority to make the requisite threshold indigency determination.

State *v.* White

## II

The defendant also claims that the trial court abused its discretion by denying his motion in limine seeking to preclude certain evidence of the victim's confidence in her identification of the defendant when presented with a photographic array by the police. The record reveals the following additional relevant facts and procedural history. In 2013, the Waterbury police received notice of a hit from the Combined DNA Index System (CODIS) database,[12] which linked the defendant's DNA profile to evidence collected during the police investigation. Detective Pesce called the victim and asked her to come to the police station, but he was "very vague" when he called and did not make her aware of the CODIS hit. On October 14, 2013, the victim went to the police station and viewed a photographic array in a double-blind, sequential procedure. Pesce had created the array, and Detective Daniel Dougherty presented the array to the victim without Pesce present. The victim identified the defendant as her attacker and wrote on the defendant's photograph: "I . . . am pretty certain that this is the young man who stabbed [me] 6 times

---

[12] "Beginning in 1994, Congress instructed the [Federal Bureau of Investigation] to establish and maintain an index of DNA samples from convicted criminals, crime scenes, and unidentified human remains. . . . In . . . 2000, Congress enacted the first federal statute affirmatively directing convicted felons to submit DNA samples to the national database. Under the DNA Analysis Backlog Elimination Act of 2000 . . . individuals convicted of a qualifying [f]ederal offense must provide a tissue, fluid, or other bodily sample for analysis. . . . After a sample is collected, unique identifying information is obtained for each felon by decoding sequences of junk DNA, which were purposely selected because they are not associated with any known physical or medical characteristics. . . . The DNA profiles are then loaded into CODIS, a national database that also contains profiles generated by state DNA collection programs, as well as DNA samples obtained from the scenes of unsolved crimes. . . . A convicted felon's failure to cooperate constitutes a class A misdemeanor and may be punished by up to one year in prison and a fine of as much as $100,000." (Internal quotation marks omitted.) *State* v. *Webb*, 128 Conn. App. 846, 852–53 n.3, 19 A.3d 678, cert. denied, 303 Conn. 907, 32 A.3d 961 (2011).

on May of 2009 at 11 p.m. . . . on Rose Street in Water-
bury . . . .''

After making the identification, the victim met with
Pesce and told him, unprompted, that she wished to
clarify what she had previously written. The victim told
Pesce that, although she had written that she was
"pretty certain," she was in fact "absolutely certain"
that the person she had identified was her attacker.
The victim then gave a statement to Pesce in which she
stated in relevant part: "On Friday I was contacted by
Detective Pesce and he asked me if I could come into
the [d]etective [b]ureau to look at some pictures. I came
in today and another [d]etective showed me a set of
photos. One of the [p]hotos that the [d]etective showed
me, jumped out at me and I realized it was the male
that stabbed me. I told the [d]etective that I was *pretty
certain* that it was the male, but I meant *absolutely
certain*. I realized that it was the same male without a
doubt that stabbed me on that night of May 17th 2009.
That night is still fresh in my mind and I could still see
my attacker's face clearly in my mind. . . .'' (Empha-
sis added.)

Prior to trial, the defendant filed two motions related
to the victim's identification of the defendant. First,
the defendant moved to suppress the victim's pretrial
identification of him from the photographic array on
the ground that it was unnecessarily suggestive and
unreliable. Second, he moved to preclude the victim's
statement to Pesce that she was "absolutely certain"
that the defendant was the person who attacked her and
any in-court statements pertaining to her confidence in
her identification of the defendant at the time of trial.
The defendant argued that the challenged testimony
would be irrelevant and unduly prejudicial, and that it
invaded the province of the jury. The trial court held
an evidentiary hearing at which the victim, Pesce and
Dougherty testified.

State *v.* White

At the conclusion of the hearing, the trial court denied the defendant's two motions.[13] In denying the defendant's motion in limine regarding the victim's confidence statements, the trial court relied on, inter alia, this court's decisions in *State* v. *Dickson*, 322 Conn. 410, 421, 141 A.3d 810 (2016), cert. denied, U.S. , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017), and *State* v. *Ledbetter*, 275 Conn. 534, 553, 881 A.2d 290 (2005) (overruled in part on other grounds by *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018)), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006), for the proposition that the level of "certainty of a witness [is] a factor for the court to consider when determining the reliability of [an] identification," and that, "as a result, clearly that information is important for the jury to consider." The trial court also concluded that such confidence testimony does not invade the province of the jury because the victim would be subject to cross-examination regarding her claimed level of certainty and because it was "going to allow the defense to present expert testimony [on] issues of identification in general." The trial court concluded that the victim's certainty in her identification "is something that goes to the weight [of the evidence], as opposed to [its] admissibility."

At trial, the victim, Pesce and Dougherty testified regarding the victim's identification of the defendant. In addition, the victim and Pesce testified regarding the victim's confidence statements. The victim testified that she had signed the array and had written that she was "pretty certain" that the photograph she had selected was of her attacker. The victim explained that, "[w]hen I said I was pretty certain, I meant—I put it in those

---

[13] For purposes of this issue, the defendant does not challenge the trial court's ruling on his motion to suppress the identification from the photographic array. Additionally, the parties agree that the victim's written statement that she was "pretty certain" the photograph she had written on was of her attacker was admissible.

words, but I meant I was absolutely certain. I just put it down as pretty certain.'' She testified that, ''[j]ust a few minutes after'' she wrote on the signed array, she told the detective that she meant ''absolutely certain.'' She said the detective asked her, ''if [she] was certain that this was the person, [then] why did [she] write pretty certain and then write absolutely [certain] on the other statement?'' The victim explained: ''I told him that . . . I wanted to be absolutely sure is the reason why I said that. I wanted to be absolutely sure that that was the person, and I didn't want to accuse someone that was not the person.'' The victim subsequently testified that, when she made the identification, she was ''absolutely certain'' that the photograph she selected was of her attacker and that, as she sat there testifying, she was ''absolutely certain'' that the photograph she selected was of her attacker. Pesce testified that, moments after Dougherty notified him that the victim had made an identification, Pesce took a statement from the victim, and, while taking her statement, he did not ask how certain she was regarding the identification. Before Pesce started taking the statement, however, the victim spontaneously said something to the effect of, ''I identified someone and on it I put that I was pretty certain, but I meant to say that I was absolutely certain.'' Pesce testified that the victim made this statement within ten or fifteen minutes of making the identification.

The defendant then presented testimony from Kevin Colwell, a professor of psychology at Southern Connecticut State University, who testified as an expert on the reliability of eyewitness identifications. Colwell testified that a confidence statement that is made at the time of viewing is the most reliable and that there appears to be no relationship between confidence statements made after an initial identification and reliability. He further testified that this is ''[b]ecause the process of having to say several times that this is the person

State *v.* White

causes us, in general, as humans, just to become more confident as we've seen the person more and more . . . ."

The trial court subsequently instructed the jury that it could "consider the strength of the identification, including the witness' degree of certainty. Certainty, however, does not mean accuracy." The trial court also instructed the jury that, "[w]hen assessing the credibility of the testimony as it relates to the issue of identification, keep in mind that it is not sufficient that the witness be free from doubt as to the correctness of the identification of the defendant; rather, you must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may find him guilty on any charge."

On appeal, the defendant, supported by the amicus curiae, The Innocence Project, argues that the trial court improperly denied his motion in limine seeking to preclude evidence of the victim's change in confidence following her photographic array identification of the defendant, her recollection at trial of her confidence in her identification at the time it was made, and her present confidence in her identification. Challenging the link between the victim's postidentification confidence statements and the accuracy of her identification, the defendant claims that the trial court abused its discretion because the victim's postidentification confidence statements were irrelevant, more prejudicial than probative, self-bolstering and invaded the province of the jury. The defendant argues that the victim's post-identification confidence statements were not relevant because, "[i]f there is no scientific support for a relationship between [the victim's] testimony at trial about her present certainty or how she recalled her past certainty, then those statements do not make it more or less probable that her identification is accurate . . . ." The amicus curiae, The Innocence Project, additionally encourages us to adopt evidentiary rules

State *v.* White

establishing that testimony on eyewitness certainty is admissible only when it stems from the earliest identification procedure that complies with General Statutes § 54-1p, Connecticut's eyewitness identification statute. In response, the state argues that the challenged evidence was relevant, was not unduly prejudicial, and did not invade the province of the jury. The state also claims that, even if the trial court abused its discretion in denying the defendant's motion, the defendant has failed to establish that such error was harmful. We agree with the state's argument that the trial court did not abuse its discretion when it denied the defendant's motion in limine seeking to preclude evidence of the victim's postidentification confidence statements.

"[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 44, 770 A.2d 908 (2001).

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1.

After the completion of briefing in the present case, we issued our decision in *State* v. *Harris*, supra, 330 Conn. 91.[14] In *Harris*, a defendant charged with, inter alia, felony murder and first degree robbery challenged the trial court's denial of his motion to suppress an out-of-court and a subsequent in-court identification of him by an eyewitness, claiming that the out-of-court identification resulted from an unnecessarily suggestive proce-

[14] On October 26 and November 8, 2018, we granted the parties permission to file supplemental briefs, which addressed, inter alia, the effect of *State* v. *Harris*, supra, 330 Conn. 91, on this appeal.

State *v.* White

dure and that both identifications were unreliable. Id.,
95–96. We concluded that the out-of-court identifica-
tion procedure was unnecessarily suggestive but that
the identification nevertheless was sufficiently reliable
to satisfy federal due process requirements. Id., 96. We
also concluded that "the due process guarantee of the
state constitution . . . provides somewhat broader
protection than the federal constitution with respect to
the admissibility of eyewitness identification testimony
but that . . . the trial court's failure to apply the state
constitutional standard that we [adopted in *Harris*]
was harmless because the court reasonably could not
have reached a different conclusion under that more
demanding standard." (Footnote omitted.) Id.

In *Harris*, we concluded, as a matter of state consti-
tutional law, that, when an eyewitness identification
allegedly results from an unnecessarily suggestive pro-
cedure, "the defendant has the initial burden of offering
some evidence that a system variable undermined the
reliability of the eyewitness identification. . . . If the
defendant meets this burden, the state must then offer
evidence demonstrating that the identification was reli-
able in light of all relevant system and estimator vari-
ables. . . . If the state adduces such evidence, the
defendant must then prove a very substantial likelihood
of misidentification. . . . If the defendant meets that
burden of proof, the identification must be suppressed."
(Citations omitted.) Id., 131. When there is evidence of
a suggestive procedure, "the trial court should consider
the eight estimator variables . . . identified in *State* v.
*Guilbert*, [306 Conn. 218, 253–54, 49 A.3d 705 (2012)]"
in determining whether the identification is reliable.[15]

---

[15] The eight estimator variables that we identified in *Guilbert* are: "(1)
there is at best a weak correlation between a witness' confidence in his or
her identification and the identification's accuracy; (2) the reliability of an
identification can be diminished by a witness' focus on a weapon; (3) high
stress at the time of observation may render a witness less able to retain
an accurate perception and memory of the observed events; (4) cross-racial
identifications are considerably less accurate than identifications involving

State *v.* White

*State* v. *Harris*, supra, 330 Conn. 133. We explained that
"the defendant and the state may adduce expert tes-
timony regarding recent scientific developments that
cast light on particular factors" during a suppression
hearing and at trial. Id., 134. We further observed that,
"even in cases in which an identification was not pre-
ceded by an unnecessarily suggestive procedure, a
defendant is entitled to present expert testimony on the
reliability of eyewitness testimony. . . . [S]uch testi-
mony satisfies the threshold admissibility requirement
. . . that [it] . . . be based on scientific knowledge
rooted in the methods and procedures of science . . .
at least with respect to the [eight estimator variables]
. . . ." (Internal quotation marks omitted.) Id., 118.

Significantly, we observed in *Harris* that "we stated
in *Guilbert* 'there is at best a weak correlation between
a witness' confidence in his or her identification and
its accuracy' . . . whereas the court in [*State* v. *Hen-
derson*, 208 N.J. 208, 292, 27 A.3d 872 (2011)] concluded
that there is a correlation between high confidence at
the time of the identification, before receiving any feed-
back or other information, and accuracy. . . . In our
view, these statements are not inconsistent. Rather,
*Guilbert* states the general rule and *Henderson* recog-
nizes an exception to that rule. In any event, to the
extent that this issue is the subject of ongoing scientific
controversy, the parties may present expert testimony
on the issue at the pretrial hearing and at trial in accor-
dance with our [decision] in *Guilbert*." (Citations omit-
ted.) *State* v. *Harris*, supra, 330 Conn. 133–34 n.31.

the same race; (5) memory diminishes most rapidly in the hours immediately
following an event and less dramatically in the days and weeks thereafter;
(6) an identification may be less reliable in the absence of a double-blind,
sequential identification procedure; (7) witnesses may develop unwarranted
confidence in their identifications if they are privy to postevent or postidenti-
fication information about the event or the identification; and (8) the accu-
racy of an eyewitness identification may be undermined by unconscious
transference, which occurs when a person seen in one context is confused
with a person seen in another." *State* v. *Guilbert*, supra, 306 Conn. 253–54.

State *v.* White

Although the defendant correctly observes that *Harris* addressed confidence statements made as part of an identification, whereas the present appeal challenges confidence statements made after an identification procedure, we nevertheless find our conclusions in that case instructive in the present appeal.

*Harris* was decided as a matter of federal and state constitutional law. Nevertheless, we observed that, "[i]n the absence of evidence of a suggestive procedure or other extraordinary circumstances . . . we continue to believe that evidence relating solely to estimator factors that affect the reliability of the identification goes to the weight, not the admissibility, of the identification. See *Perry* v. *New Hampshire*, [565 U.S. 228, 237, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012)] ('[t]he [c]onstitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy'); see also id. ('juries are assigned the task of determining the reliability of the evidence presented at trial' unless '[the] evidence is so extremely unfair that its admission violates fundamental conceptions of justice' . . .); *State* v. *Guilbert*, supra, 306 Conn. 251 n.31 (this court's 'approach to eyewitness identification testimony [that is not tainted by improper procedure] is exactly the sort of approach that *Perry* encourages'); *State* v. *Ledbetter*, supra, 185 Conn. 612 ('challenges [relating to the reliability of identifications that are not tainted by improper procedure] go to the weight rather than to the admissibility of the evidence'). Accordingly, like the court in *Henderson,* we conclude that a pretrial hearing ordinarily is not required when there is no evidence of a suggestive procedure. See *State* v. *Henderson*, supra, 208 N.J. 293–94. Indeed, even the Supreme Court of Oregon, which concluded that an identification that was not preceded by a suggestive procedure may be inadmissible under that

state's ordinary rules of evidence, has recognized that
'trial courts will continue to admit most eyewitness
identifications. That is so because, although possible, it
is doubtful that issues concerning one or more of the
estimator variables that [the court has] identified will,
without more, be enough to support an inference of unreliability sufficient to justify the exclusion of the eyewitness identification. In that regard, [the court] anticipate[s] that when the facts of a case reveal only issues
regarding estimator variables, defendants will not seek
a pretrial ruling on the admission of the eyewitness
identification.' *State* v. *Lawson*, [352 Or. 724, 762, 291
P.3d 673 (2012)]. Thus, that court recognized that evidence relating to estimator variables, standing alone,
ordinarily will not render an identification inadmissible.'' *State* v. *Harris*, supra, 330 Conn. 132–33.

In the present case, the trial court's decision to admit
evidence of the victim's postidentification confidence
statements and expert testimony from the defendant
concerning the connection between confidence statements and reliability and accuracy allowed for the
presentation of current scientific evidence on the relationship between confidence and accuracy, while also
leaving to the jury the ultimate decision of which evidence to credit. Moreover, there was no evidence of a
suggestive procedure in this case, and the defendant
does not challenge in this appeal the trial court's denial of
his motion to suppress the identification itself. In *Harris*,
we noted that, ''[i]n the absence of evidence of a suggestive procedure or other extraordinary circumstances
. . . evidence relating solely to estimator factors that
affect the reliability of the identification *goes to the
weight, not the admissibility*, of the identification.''
(Emphasis added.) Id., 132. Among those estimator factors is the confidence of the eyewitness. Id., 124 n.26.
Accordingly, we conclude that the trial court did not
abuse its discretion in concluding that the victim's confidence statements were relevant evidence.

State *v.* White

Moreover, under the case law governing at the time of the trial court's decision on the motion to suppress, a witness' confidence in an identification, both at the time it was made *and* at trial, is a relevant factor to be considered in determining whether an identification is reliable as both a constitutional and evidentiary matter. See *Manson* v. *Brathwaite*, 432 U.S. 98, 108, 115–16, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) (level of certainty testified to at trial was factor that supported reliability of identification); *Neil* v. *Biggers*, 409 U.S. 188, 195–96, 200–201, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) (same); *State* v. *Dickson*, supra, 322 Conn. 421 (" 'level of certainty' " is factor to be considered in determining whether identification made during unnecessarily suggestive procedure is reliable);[16] *State* v. *Crosby*, 182 Conn. App. 373, 409, 190 A.3d 1 (fact that eyewitnesses testified at suppression hearing that they were "100 percent certain at the time of the identification that the defendant was the perpetrator" supports reliability of identification), cert. denied, 330 Conn. 911, 190 A.3d 1 (2018). In light of this existing case law, it was not an abuse of discretion for the trial court to conclude that the victim's professed level of confidence in her identification shortly after her identification and at trial was relevant to the jury's determination of whether the defendant was the individual who attacked the victim.

[16] In *State* v. *Dickson*, supra, 322 Conn. 448 n.32, we concluded that cross-examination is a "sufficiently effective tool" to test the reliability of a witness' in-court statement in which the witness expresses a higher degree of confidence than in that same witness' prior out-of-court statement. We observed that a defendant "can present expert testimony that there is a weak correlation between confidence and accuracy, that memory degrades over time, and that witnesses may develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information . . . ." (Internal quotation marks omitted.) Id. If cross-examination is a sufficiently effective tool to test the reliability of an in-court statement in which the witness expresses a higher degree of confidence than in a prior out-of-court statement, then it is also a sufficiently effective tool to test the reliability of an in-court statement that involves the same confidence level as a statement given only minutes after an initial identification, as was the situation in the present case.

We note that the victim's confidence statement made shortly after her identification, in which she said she was "absolutely certain," was relevant to more than just the reliability of her identification; additionally, it clarified the meaning of what she wrote on the photograph when she initially identified the defendant as her attacker. The evidence showed that, within ten or fifteen minutes of her first confidence statement written on the photograph of the defendant, the victim, unprompted, told the police that the words she wrote did not accurately demonstrate her level of confidence at the time she made the initial identification. Because, as the defendant concedes, the confidence statement made by the victim at the time of the identification "may have some relationship to the identification's reliability," it was not arbitrary or unreasonable for the trial court to conclude that evidence of what the victim meant by her initial confidence statement was relevant, particularly when such evidence came without prompting by the police.

The defendant also claims that the victim's postidentification confidence statements regarding her identification were more prejudicial than probative. Pursuant to the Connecticut Code of Evidence, "[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Conn. Code Evid. § 4-3. "Situations in which relevant evidence should be excluded because of prejudice include: (1) if the facts offered may unduly arouse the jury's emotions, hostility, or sympathy; (2) if the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues; (3) if the evidence offered and the counterproof will consume an undue amount of time; and (4) if the defendant, having no reasonable ground to anticipate the evidence, is unfairly

State *v.* White

surprised." E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 4.5.1, p. 151. We observe that the victim's postidentification confidence statements do not fit neatly into the conventional categories of what constitutes unduly prejudicial evidence. The defendant's argument appears to be that, because eyewitness testimony is likely to be believed by jurors when offered with a high level of confidence, the victim's confidence statements were prejudicial given their "minimal" probative value. We do not agree that such confidence statements would unduly arouse the emotions of the jurors or be so persuasive as to overwhelm the jury's capacity to fairly evaluate the evidence in the case. Further, as noted previously, it was neither arbitrary nor unreasonable for the trial court to conclude that the confidence statements were relevant or more than "minimally" probative. Under these circumstances, it was not arbitrary or unreasonable for the trial court to conclude that the victim's postidentification confidence statements were not more prejudicial than probative.

The defendant further claims that an eyewitness' testimony regarding confidence in a prior identification is self-bolstering and invades the province of the jury. "Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact . . . ." Conn. Code Evid. § 7-3 (a). The defendant relies on case law observing that a witness may not comment on another witness' credibility and that an expert witness is not permitted to give an opinion as to whether another witness is lying or telling the truth. See, e.g., *State* v. *Singh*, 259 Conn. 693, 706–708, 793 A.2d 226 (2002); E. Prescott, supra, § 7.10.4, p. 475. Although questions that require a witness to express an opinion on the credibility of another witness invade the jury's province because the jury is the exclusive judge of credibility; see *State* v. *Singh*, supra, 707; a witness' testimony regarding her own confidence in her

State *v.* White

identification does not invade the jury's province because such testimony, regarding something of which the witness has personal knowledge, is simply a tool to be used by the jury to evaluate the accuracy or credibility of the witness' identification. For that reason, it was not arbitrary or unreasonable for the trial court to conclude that the witness' postidentification confidence statements did not invade the province of the jury.

Finally, we address the suggestion of the amicus curiae, The Innocence Project, that we adopt evidentiary rules establishing that testimony concerning eyewitness certainty should be admitted only when it stems from the earliest identification procedure that complies with § 54-1p, Connecticut's eyewitness identification statute.[17] The Innocence Project argues that evidence of eyewitness certainty, in all other circumstances, lacks sufficient reliability, relevance, and probative value. We decline The Innocence Project's invitation to establish a categorical rule concerning the admission of postidentification confidence statements.

The Innocence Project, relying on social science research, emphasizes that confident eyewitnesses are often inaccurate and that eyewitness confidence can be

_____

[17] We address The Innocence Project's well briefed request that we adopt an evidentiary rule on this point, even though the defendant does not formally ask us to do so. See, e.g., *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 550 n.35, 93 A.3d 1142 (2014) ("[a]lthough an amicus brief can be helpful in elaborating issues properly presented by the parties, it is normally not a method for injecting new issues into an appeal, at least in cases [in which] the parties are competently represented by counsel" (internal quotation marks omitted)). We reach The Innocence Project's request because, were we to agree with the defendant's core evidentiary arguments—particularly with respect to relevance, bolstering, and prejudice exceeding probative value—we would, in effect, create the per se bar sought by The Innocence Project. Put differently, The Innocence Project's arguments on this point use social science data to support the arguments raised by the defendant, and we do not read them to seek relief different from that sought by the defendant, which is similarly limited to the admissibility of eyewitness confidence statements taken outside the § 54-1p procedure.

State *v.* White

an extremely influential factor in jury determinations of
an eyewitness' accuracy. See G. Wells et al., ''The Confi-
dence of Eyewitnesses in Their Identifications from
Lineups,'' 11 Current Directions Psychol. Sci. 151, 151,
153 (2002) (in study, ''[m]istaken identification by eye-
witnesses was the primary evidence used to convict
innocent people whose convictions were later over-
turned by forensic DNA tests,'' and ''three fourths of
these convictions of innocent persons involved mista-
ken eyewitness identifications, and, in every case, the
mistaken eyewitnesses were extremely confident, and,
therefore, persuasive at trial''); Massachusetts Supreme
Judicial Court Study Group on Eyewitness Evidence,
Report and Recommendations to the Justices (July 25,
2013) p. 20, available at http://www.mass.gov/courts/
docs/sjc/docs/eyewitness-evidence-report-2013.pdf
(last visited February 24, 2020) (''eyewitness confidence
is the single most influential factor in juror determina-
tions regarding the accuracy of an eyewitness identi-
fication'' (internal quotation marks omitted)). The Inno-
cence Project argues that eyewitness statements *can* be
relevant and probative when they are the result of proce-
dures that minimize the possibility of suggestion and
memory contamination,[18] such as the procedures
endorsed by the legislature in § 54-1p. However, confi-
dence statements beyond those captured at the initial
identification procedure are more prejudicial than pro-

[18] The Innocence Project cites a number of studies to support the proposi-
tion that witness confidence is susceptible to, and can be inflated by, sugges-
tion and postconfirmation feedback. We observe that, in the present case,
there is nothing in the record to suggest that the victim's confidence state-
ments resulted from, or were inflated by, suggestion or postconfirmation
feedback. In fact, the defendant has not challenged the initial identification
on the ground that it was unduly suggestive, and the record indicates that
the victim's clarifying statement given to Pesce shortly following her initial
identification was given unprompted by the police. In the absence of a
record suggesting the influence of suggestion or feedback, we decline The
Innocence Project's invitation to speculate as to whether the victim's mem-
ory was contaminated.

State *v.* White

bative because a witness' sincerely held belief cannot be effectively challenged on cross-examination.

We decline to categorically conclude that there is *no* correlation between a witness' postidentification confidence in his or her identification and the accuracy of that identification, especially given our recent reaffirmation in *Harris* of the process that already exists, following *Guilbert*, to address concerns regarding the link between confidence and accuracy. See *State* v. *Harris*, supra, 330 Conn. 132 ("[i]n the absence of evidence of a suggestive procedure or other extraordinary circumstances . . . evidence relating solely to estimator factors that affect the reliability of the identification goes to the weight, not the admissibility, of the identification"). In *Harris*, we concluded that, "as an evidentiary matter, and even in cases in which an identification was not preceded by an unnecessarily suggestive procedure, a defendant is entitled to present expert testimony on the reliability of eyewitness testimony." Id., 118. Such expert testimony may properly challenge the reliability of postidentification confidence statements based on relevant science. That is precisely what happened in the present case. The trial court admitted the witness' confidence statements, permitted the defendant's expert witness to testify about the reliability of eyewitness testimony,[19] and appropriately instructed the jury that it could "consider the strength of the identification, including the witness' degree of certainty. Certainty, however, does not mean accuracy." The trial court also instructed the jury that, "[w]hen assessing the credibility of the testimony as it relates to the issue of identification, keep in mind that it is not

[19] Colwell, the defendant's expert witness, testified, inter alia, that confidence statements made at the time of an initial viewing are more reliable, that there does not appear to be a relationship between confidence statements that are made subsequent to an initial viewing and reliability, and that subsequent confidence statements are not correlated with reliability or accuracy.

sufficient that the witness be free from doubt as to the correctness of the identification of the defendant; rather, you must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may find him guilty on any charge.''

The Innocence Project has failed to demonstrate any great shift in the relevant science since our decision in *Harris* that would warrant the imposition of a per se exclusionary rule or a departure from the process enumerated in *Guilbert*, *Dickson*, and *Harris*, which allows for the admission of both postidentification confidence statements and expert testimony to challenge the reliability and accuracy of those statements. Accordingly, we conclude that the trial court did not abuse its discretion by denying the defendant's motion in limine seeking to preclude evidence of the victim's postidentification confidence in her identification of the defendant as her attacker.

The judgment is affirmed.

In this opinion the other justices concurred.

D'AURIA, J., with whom PALMER, McDONALD and ECKER, Js., join, concurring. I agree fully with part II of the majority opinion. I also agree with the majority's conclusion in part I of its opinion that there is an insufficient record in the present case to afford the defendant, John White, review of his constitutional claim, let alone the new trial he requests on this direct appeal. Although I join the majority's opinion, I write separately because over the course of a quarter of a century as a civil servant, I have developed what I humbly believe to be a finely tuned ear to governmental refrains of ''not my job'' and ''we don't have a budget for that.'' Thus, I feel compelled to comment on how often this bureaucratic jockeying can strike a discordant note that does not focus appropriately on the rights of the accused.

State *v.* White

The defendant denies it was he who, in 2009, stabbed the victim with a box cutter and caused her serious injuries while she walked back to a friend's home from the store she had gone to for something to drink. The defendant went to trial without the assistance of a DNA expert to counter the state's expert, or at least to consult for purposes of cross-examination. This was perhaps not advisable. See P. Giannelli, ''*Ake v. Oklahoma*: The Right to Expert Assistance in A Post-*Daubert*, Post-DNA World,'' 89 Cornell L. Rev. 1305, 1315 (2004) (''[f]ew defense attorneys can deal with this type of sophisticated evidence—which raises issues 'at the cutting edge of modern law and science'—without expert assistance'' (footnote omitted)). The defendant claims this was not his preference but that, instead, the actions and inactions of several state agencies combined to place him in this predicament.

In 2013, the Waterbury police obtained information about a potential DNA match on a red sweatshirt recovered near the crime scene. Soon thereafter, the victim identified the defendant in a double-blind, sequential photographic array procedure. As the majority indicates, there is some dispute about how certain the victim said she was about her identification. Not until 2016 was the defendant arrested and charged with assault in the first degree in violation of General Statutes § 53a-59 (a) (1).

Two days after jury selection began, the state gave notice of its intent to offer DNA evidence pursuant to General Statutes § 54-86k and moved to sample the defendant's DNA by buccal swab pursuant to Practice Book § 40-34 (6). The state conceded at the time that this notice and motion were clearly untimely under § 54-86k (c). Although the state did not seek to justify (or apologize for) the late disclosure, the trial court—while emphasizing that ''this is not an excuse'' and not the proper way to try cases—was moved to put on the record that the case had been assigned to another prose-

State *v.* White

cutor before being reassigned to the prosecutor who tried the case and provided the late disclosure. For its part, the state focused on the fact that, in its view, there was no real prejudice to the defendant because "the DNA evidence was present from the onset." By this it appears that the state meant that the arrest warrant indicated that a DNA sample taken from the red sweatshirt had generated a "hit" from the CODIS DNA database,[1] linking the defendant to the DNA sample and leading the police to focus on him as a suspect.[2]

Over the defendant's objection, the trial court permitted the state to offer DNA evidence at trial and granted the state's motion for the buccal swab. To mitigate any prejudice to the defendant, however, the trial court suspended jury selection, dismissed the two jurors already selected, and permitted the defendant a continuance for as much time as he needed to attempt to locate an expert, reframe his defense, and prepare for trial in light of the state's late disclosure.[3]

The next day, the defendant filed with the trial court a motion for costs associated with the retention of a DNA expert. He argued that the state's late disclosure caused him a different kind of prejudice that could not be cured simply by a continuance. Particularly, the defendant's counsel, Attorney Ioannis A. Kaloidis, represented to the court that the defendant's wife had paid for his private counsel and for expenses related to retaining an eyewitness identification and memory expert. The defendant claims, however, that when the state notified him after jury selection had begun of its intent to perform additional DNA testing, which later

---

[1] See, e.g., *State* v. *Webb*, 128 Conn. App. 846, 852–83 n.3, 19 A.3d 678 (generally describing national CODIS database), cert. denied, 303 Conn. 907, 32 A.3d 961 (2011).

[2] This "hit" occurred three years before the defendant's arrest. The state never sought confirmatory evidence from the defendant until jury selection had begun.

[3] On appeal, the defendant does not challenge this ruling.

State *v.* White

resulted in evidence of DNA from both the defendant and the victim being present on the red hooded sweatshirt, his family could not afford the additional funds necessary for a DNA expert. The defendant testified on the record that he had no sources of income, owned no property and had no money in any bank account.

The trial court denied the defendant's motion for costs because it determined that the defendant was required to seek funding from the Public Defender Services Commission (commission) and, thus, the court could not make a finding of indigency. The trial court then provided the defendant with the opportunity to file an application with the commission to investigate his claim of indigency but the defendant declined.

As I have mentioned, I ultimately agree that the record is inadequate in this case to address the defendant's constitutional claim or to afford him relief. Specifically, as I will discuss, because the defendant never filed an application with the commission, it is not clear that the commission would have in fact required him to choose between receiving funding and continued representation by his private attorney, thereby potentially burdening his constitutional right to counsel of his choice. Additionally, despite the defendant's unchallenged testimony, it is not perfectly clear on this record that the defendant would have been found indigent by the commission, or could have been found indigent by the court. Nevertheless, I am troubled by several aspects of this case.

First, I am concerned how the actions and inactions of different state actors—focused on their own missions—might in some cases combine to jeopardize a defendant's constitutional rights. I will address these actors in turn.

Like the trial court, I cast no aspersions of bad faith on the prosecution. Most of us, while in the practice of

State *v.* White

law or in public service, have missed deadlines or been overwhelmed by other demands. However, it is too easy for the state simply to acknowledge its untimely disclosure, argue that the public interest should not suffer for the prosecutor's mistake, and suggest that with a continuance all will be well. No one is well served when rules are not followed. Putting aside the inconvenience and cost to the court, to opposing counsel and to jurors summoned and discharged, a late disclosure, as in the present case, might prejudice an accused's constitutional rights, or at least create a claim on appeal that could have been obviated. And a continuance of the trial—which, in this case, was in its incipient stage—will not necessarily cure all the harm. In reliance on a firm trial date and the state's actions or inactions, the defendant and his counsel are likely to have taken positions or made choices that will likely be held against the defendant as "strategic" if he is convicted and challenges his conviction in another forum. See, e.g., *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 521, 964 A.2d 1186 ("the decision whether to call a particular witness falls into the realm of trial strategy, which is typically left to the discretion of trial counsel"), cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009). For related reasons, it is not difficult to find cases in which parties have been precluded from disclosing experts in analogous situations.[4] See *Hicks* v. *State*, 287 Conn. 421, 445, 948 A.2d 982 (2008) (in negligence case, trial court did not abuse its discretion by pre-

---

[4] Although the defendant does not challenge the trial court's decision in this case to permit the untimely disclosure, and ultimately the DNA expert's testimony, the apparent unfairness of the state's untimely disclosure and its effect on the defendant should be noted. When the state disclosed this expert, two jurors had already been chosen and had to be discharged. Although the trial court made no finding of bad faith, and I attribute none to the state, surely this taxes the court's indulgence. Reliance on the stakes of the case to the public and the victim to justify such late disclosures promotes neither compliance with the rules, the public's interest nor the constitutional interests of the accused.

State *v.* White

cluding untimely disclosed expert because trial already
had commenced); *Pool* v. *Bell*, 209 Conn. 536, 541–42, 551
A.2d 1254 (1989) (in medical malpractice case, trial court
did not abuse its discretion by precluding untimely dis-
closed expert because delay was due to improper " 'cat
and mouse' " game and plaintiff would have had little
time to discover and investigate expert's opinions); see
also *Gyerko* v. *Gyerko*, 113 Conn. App. 298, 317, 966 A.2d
306 (2009); *Tornaquindici* v. *Keggi*, 94 Conn. App. 828,
848, 894 A.2d 1019 (2006).

In the present case, the defendant claims that by the
time of the late disclosure, on the basis of the state's
framing of the case, he already had retained an iden-
tification expert with the money his wife was able to
muster for his defense. His privately retained counsel
represented that the defendant's wife was not in a posi-
tion to pay for another expert. We do not have a record
that would test whether this representation is accurate
but it is certainly plausible that if the state had timely
disclosed the DNA expert, the defendant would have
allocated his resources differently. Yet, after placing the
defendant in this dilemma, once its motion for untimely
disclosure was granted, the state expressed no interest
in the resolution of the funding issue, stating that that
was between the defendant and the commission. Most
troubling to me about the prosecution's indifferent posi-
tion is that it's accurate: one arm of the state (the prose-
cution) having created the problem and another (the
court) having countenanced the state's late disclosure,
it was not the prosecution's problem to resolve. Instead,
the court directed the defendant to a third agency of
the state (the commission) for help. But as we will see,
for its own reasons, the commission—predictably and
somewhat understandably—did not embrace its role
as the default fiscal source for such unique situations.
Rather, the commission has taken the position that even
if the defendant in this case was constitutionally entitled
to the funding he sought, the commission was not

State *v.* White

required to provide this funding because it is only
required to fund defense costs for its own clients, and
"[t]here is no funding that is appropriated by the legi-
slature to pay for defense costs of the private bar who
represent they have run out of money to pay for experts,
investigators and other defense costs." The commission
took a similar stance in *State* v. *Wang*, 312 Conn. 222,
92 A.3d 220 (2014), arguing that there was "no statutory
authorization or funding appropriated for [it] to pay for
experts or investigation from its budget for a pro se
litigant who is not its client."

Second, I am concerned that aspects of the majority's
reasoning might be read to unduly limit the trial court's
and this court's ability to review and resolve legal claims
that arise when an indigent defendant's due process
right to present a defense, which entitles him to fund-
ing for expert costs, is intertwined with his right to
counsel. As in *Wang*, the majority in the present case
declares that the Judicial Branch is not authorized to
fund reasonably necessary defense costs. See *State* v.
*Wang*, supra, 312 Conn. 256 and n.33. The court in *Wang*
suggested that a court order that funds be made avail-
able in these instances might offend notions of sepa-
ration of powers by "usurp[ing] the power of the legi-
slature to devise a state budget." Id., 256 n.33. Further
encroachment would occur, the court reasoned, if a
court were itself to make a finding of indigency rather
than the commission in the first instance. Id., 263–64.
Although ultimately the defendant does not ask us to
overrule *Wang*, I think both propositions might be
somewhat overstated.

I believe, rather, on the basis of those same separation
of powers principles, that it would be reasonable to
conclude that the judiciary—an independent branch of
government—would not be prevented from paying for
such costs itself if a court determined they were consti-
tutionally necessary. True, the Judicial Branch might
not have received a specific appropriation for such

State *v.* White

costs. If we listen closely to the position of the commission, however—both in *Wang* and in the present case—neither has the commission. See id., 246 n.24. The commission's point is that it has projected its *own* expenditures and been appropriated funds that are based on the needs *of its own clients*, not the needs of someone else's clients, the needs of those defendants who run out of money or the needs of those representing themselves. After this case, the commission might have to ask the legislature to adjust its budgetary projections on the basis of additional responsibilities it had not previously anticipated, as it had to do after *Wang*.[5]

At the very least, nothing prevents a court from declaring what the constitution demands, leaving it to the legislative and executive branches to determine which state agency should pay for it. This court has at times indicated that it does not offend the separation of powers to issue rulings that would have costs beyond what has been budgeted, leaving it to the political branches to determine how to allocate those costs. See *Pellegrino* v. *O'Neill*, 193 Conn. 670, 675–76, 480 A.2d 476 ("[T]he judiciary, as an independent branch of government, has inherent power to direct other governmental agencies to provide such funds as may be necessary

---

[5] After *Wang*, the commission in 2015 requested deficiency appropriations of approximately $6.3 million, caused, in part, by this court's decision in *Wang*. See Conn. Joint Standing Committee Hearings, Appropriations, Pt. 15, p. 6730, written testimony of Susan O. Storey, Chief Public Defender, Division of Public Defender Services, concerning House Bill 6825, April 21, 2015, available at https://www.cga.ct.gov/2015/appdata/tmy/2015HB-06825-R000421-Agency%20-%20Office%20of%20the%20Chief%20Public%20Defender%20-%20Susan%20O.%20Storey-TMY.PDF. The commission represented that it had not budgeted for the costs associated with *Wang* because "[h]istorically, these expenditures had been court ordered and paid for by the [j]udicial [d]epartment." Id. It was noted, however, that during the 2015 fiscal year, there was only one indigent self-represented defendant who required expert witness funding. See Analysis of Finance Advisory Committee Meeting Items, concerning House Bill No. 6825 (March 5, 2015), available at https://www.cga.ct.gov/ofa/Documents/year/FAC/2015FAC-20150305_March%202015%20OFA%20Analysis%20of%20FAC%20Budgetary%20Transfers.pdf.

State *v.* White

for the reasonably efficient operation of the courts.
. . . In the absence of a special appropriation the exis-
tence of a law requiring an expenditure to be incurred
is an appropriation of money for that purpose, and the
law imposes on the comptroller the duty of settling and
adjusting demands against the state for such expenses.''
(Citations omitted; internal quotation marks omitted.)),
cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d
176 (1984); see also *Pamela B.* v. *Ment*, 244 Conn. 296,
329, 709 A.2d 1089 (1998) (explaining that court orders
pertaining to judicial resources are not improper merely
because ''there are many competing constraints upon
the resources the judicial department has available with
which to satisfy other constitutional mandates''). The
question of which agency pays for constitutionally nec-
essary costs should not drive our analysis or prevent
us from deciding a legal issue properly presented. See
*In re Taijha H.-B.*, 333 Conn. 297, 335–36, 216 A.3d 601
(2019); id., 335 (''the benefits of obtaining a second
opinion in the form of some limited judicial review of
counsel's no merit determination more than offset the
potential costs'').

Commendably, in my view, Judge Devlin cut to the
chase in *State* v. *Garvins*, Superior Court, judicial dis-
trict of Fairfield, Docket No. CR-16-293596-T (Decem-
ber 12, 2017) (65 Conn. L. Rptr. 596), in which the
defendant was represented by pro bono counsel who
requested that the trial court approve funding for a psy-
chiatric examination after the commission had denied
his request on the ground that the defendant was being
represented by privately retained counsel. Judge Dev-
lin convened a hearing on the matter at which coun-
sel for the commission appeared and represented that
although the defendant satisfied the indigency require-
ment, he was not eligible for funding for defense costs
by the commission because he had private counsel and,
thus, was not the commission's client. Id. The court
disagreed. On the basis of a financial affidavit, the court

independently found that the defendant was indigent, determined that the requested examination was "reasonably necessary" to "formulate and possibly present a defense based on mental disease or defect"; id.; and determined that it was unconstitutional to force an indigent defendant to choose between his due process right to present a defense and his right to counsel. Only then did the court pose the question on the lips of all agencies involved: "[W]here should the public funds come from to pay such expense . . . ." Id., 597. Judge Devlin granted the defendant's motion for funds, ordered the defendant to follow the commission's protocol for applying for the funds, and ordered the commission not to unreasonably deny the funds. Id., 596.

I do not believe these determinations of questions squarely presented offended the separation of powers doctrine. Following the reasoning of *Wang*, Judge Devlin answered the legal question at issue between the defendant and the commission—whether the defendant was eligible to receive funding from the commission despite representation by private counsel—and in doing so vindicated the core missions of the Judicial Branch: resolving disputes and protecting the rights of litigants.

If the defendant and the trial court in the present case had followed a similar procedure—if the defendant had applied for funding with the commission, the commission had denied funding due to an unresolved legal issue, and the trial court had determined the defendant's eligibility for funding in light of his representation by private counsel—I do not believe that the court would have acted outside its authority. Even if the trial court believed it could not have made the indigency determination, it certainly could have sent the defendant off to the commission with a ruling that if the defendant was indigent, then in fact the commission must provide him with reasonably necessary funds for expert witnesses, irrespective of whether he had private counsel.

State *v.* White

Nevertheless, I cannot conclude that the majority is incorrect that our statutes generally contemplate— and that it is appropriate policy—that a defendant should in the first instance proceed through the commission to determine whether he is indigent, regardless of whether he is represented by a public defender or an attorney assigned to him by the commission or by private counsel. See *State* v. *Wang*, supra, 312 Conn. 250–51; id., 251 (explaining history and purpose of commission, including that commission was "charged . . . with [the broad purpose of] protecting the rights of indigent defendants"). But, to the extent that the majority seems to create an exhaustion-like requirement (i.e., the defendant *must* proceed through the commission for a predicate finding of indigency before turning to the courts), I have some concerns.

It is unclear to me that there was a defined path as to how the defendant was supposed to navigate this situation, which, I again note, was not of his own making but was a result of the prosecution's untimely action. Typically, in cases implicating the exhaustion of administrative remedies, it is clear both that a party must exhaust those remedies and how to go about doing so. *Wang* itself specifically confined its applicability to indigent self-represented defendants. Id., 239 n.18. It did not chart a path forward for how to proceed when the defendant is represented by pro bono counsel and is indigent, or is represented by privately retained counsel but has *become* indigent. That this is true is evidenced by the positions taken by the commission in both *Wang* and this case.

Although in the present case, the majority, like the trial court, suggests that the commission might have permitted the defendant to retain his private counsel and still access funding for defense costs,[6] the commis-

[6] As the majority explains, "the trial court expressly stated that Kaloidis would be permitted to continue to represent the defendant during the application process and offered the defendant other options, such as continuing to

State *v.* White

sion, appearing as amicus curiae in this case, threw cold water on that notion. In fact, the commission's internal policy manual states flatly—after *Wang*—that it will not provide funding for experts to indigent defendants with private counsel. In its amicus brief to this court, the commission explains that, because *Wang* did not determine whether a defendant represented by private counsel could obtain state funding for costs, it has "adopted a policy that only indigent pro se litigants or individuals represented by a public defender or assigned counsel can access funding for experts or other expenses. If a person represented by a private attorney seeks funding, they must also accept representation from the public defender or proceed pro se. The private attorney must withdraw his appearance. The case will be referred to the local public defender office for an eligibility determination and, if the defendant is indigent, the case will be assigned to an attorney in the office or to assigned counsel if there is a conflict of interest."

The policy manual does provide a possible workaround—once private counsel is removed, the commission may appoint the same previously retained private counsel as assigned counsel if the best interest of the client so warrants. Although the commission has informed this court that this procedure recently has been followed in at least one other case, it is unclear whether it routinely allows indigent defendants to keep their previously retained private counsel. In fact, the commission's policy manual suggests that such an arrangement would be an exceptional circumstance.[7]

_____

represent the defendant as a special public defender, standby counsel, or with cocounsel, to be determined later.''

[7] The commission's policy manual states: "It is the policy of the [c]ommission that the Office of Chief Public Defender (OCPD) should not assign a case to any attorney for compensation as an [a]ssigned [c]ounsel after that attorney has been previously privately retained in that case, *unless the OCPD determines that such appointment would be in the best interests of the client.*'' (Emphasis added.)

State *v.* White

Thus, with the benefit of hindsight and briefing it is fine to parse the commission's position and conclude, as the majority does, that ''we do not understand the [commission's] amicus brief to suggest that the relationship with private counsel must be terminated before the commission conducts an initial investigation of indigency and reviews the application for assistance with defense costs; rather, we understand that policy to suggest that any defendant seeking public funding for defense costs must ultimately accept representation from the public defender or proceed as a self-represented party prior to receiving such funding once eligibility is determined.'' (Emphasis omitted.) But the defendant in the present case had to decide what to do at a time when his trial was about to begin, and with at least some uncertainty, given the commission's articulated policy and litigation positions, as to whether he would end up with his constitutionally entitled counsel of choice: counsel who had prepared his case with him and already had begun picking a jury before the state's late disclosure.[8] The majority might not be ''convinced that, simply by applying to the public defender's office, the defendant would be compelled to forgo his right to counsel in order for the public defender's office to make an indigency determination,'' but that was not of comfort to the defendant at the time. He had no assurances that he would receive counsel of his choice.

Nevertheless, because the defendant never applied to the commission in this case, and because we cannot know if the commission would have required the defendant to dismiss his private counsel to access funding

[8] I note that this could raise other constitutional concerns, for example, whether requiring a defendant to abide by the commission's stated procedure of requiring a defendant to fire his private counsel and accept representation by the commission to obtain funding for defense costs unconstitutionally burdens his rights to counsel and to present a defense. In the present case, the trial court's suggestions for how the commission might handle the situation appear merely speculative. However, because the defendant in the present case did not file an application with the commission, and thus we do not know if the commission would have required the defendant to fire his private counsel to obtain funding, the record is inadequate to review this issue.

for expert costs or would have found him indigent, we cannot reach the defendant's constitutional claim. I emphasize, however, that rather than setting up road-blocks, state actors should be cognizant of their responsibility to provide a clear pathway for indigent defendants to access the resources to which they are constitutionally entitled. It should be made clear to indigent defendants that, to access funding for defense costs, they first must apply with the commission but that if they are denied funding—for any reason—they may then seek review by the trial court. Under those circumstances, the trial court not only has the authority, but is obligated, to resolve any legal claims that arise, such as whether a defendant's right to counsel is violated by conditioning his constitutional right to funding for defense costs on representation by a public defender or an attorney assigned to him by the commission. Although the commission is the state entity responsible for determining indigency in the first instance and providing funding for defense costs, it is imperative that state actors—including the court and the prosecution—work in tandem to ensure that indigent defendants are aware of this procedure, especially when the need for additional funding is, at least in part, the byproduct of a state actor's untimely actions.

———————————————